Pittsburgh Industrial Engineering Company v. Commissioner.
Pittsburgh Indus. Eng'g Co. v. Commissioner
Docket No. 21644.
United States Tax Court
1950 Tax Ct. Memo LEXIS 8; 9 T.C.M. (CCH) 1132; T.C.M. (RIA) 50315; December 19, 1950
*8 In determining petitioner's income and excess-profits taxes for the taxable years 1941, 1942, 1943 and 1944, 1. Respondent erred in including in taxable income for 1941 a surplus adjustment of $4,648.28 credited on petitioner's books in December of 1942. 2. In 1943 petitioner did not realize a taxable gain from the sale of gas air shovels. 3. In 1943, 1944 and 1945, petitioner sustained certain deductible losses in the operation of a farm and from the sale of such farm in 1945. 4. For 1942 and 1943 petitioner is entitled to deductions of the respective amounts of $6,451.99 and $3,603.96 on account of certain traveling expenses incurred in those years as ordinary and necessary business expenses. 5. For 1944 petitioner properly credited $3,055.77, received in that year from the Defense Plant Corp., for traveling expenses incurred in prior years, against traveling expenses incurred in 1944. 6. For 1943 petitioner is entitled to deduct the amounts of $965.28 and $575.60 for traveling expenses, as ordinary and necessary business expenses. 7. For 1943, 1944 and 1945 petitioner is entitled to deduct the respective amounts of $702.50, $398.57 and $480.73, expenditures for automobile *9 and truck tires used in its business in those years, as ordinary and necessary business expenses. 8. For 1943 petitioner is entitled to deduct $8,013.67 as an ordinary and necessary business expense for work done in that year, which was erroneously charged to the Cook Contracting Co. 9. For 1944 petitioner is entitled to deduct the sum of $17,483.62 as a bad debt of Cook Contracting Co. which became worthless in that year. 10. For each of the taxable years petitioner was entitled to include $20,000, representing 200 shares of petitioner's capital stock exchanged in 1936 for certain machinery and equipment, in its invested capital in determining its excess-profits tax credit based on invested capital. 11. For each of the taxable years petitioner is entitled to depreciation on the machinery and equipment thus acquired, in the amount of $1,200.02 for each of such years. 12. Petitioner is entitled to depreciation on leasehold improvements for the years 1943, 1944, and 1945, in the respective amounts of $4,369.78, $5,555.86, and $5,555.86. 13. Petitioner is entitled to deduct in each of the taxable years as reasonable compensation for its officers the respective amounts paid *10 therefor in such years, as ordinary and necessary business expenses. 14. The amount of $4,603.58, representing sundry credits to surplus in 1945 in connection with traveling expenses incurred in the Glassport project in 1942 and 1943 and allowed as such here, is to be given proper consideration in the recomputation under Rule 50. Sidney B. Gambill, Esq., for the petitioner. W. Morgan Hunter, Esq., and Kalman A. Goldring, Esq., for the respondent. LEECH *11 Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves deficiencies in income and excess-profits taxes, as follows: Excess-
Year
Income Tax
Profits Tax
1941
$6,666.23
$14,544.38
1942
38,860.55
1943
3,887.33
1944
412.62 No deficiencies have been determined for the years 1939, 1940 and 1945. However, since petitioner is claiming carry-overs and carry-back of alleged net operating losses and unused excess-profits credits from such years, the amount of petitioner's net income for each of the years 1939, 1940 and 1945 is in controversy. See Birch Ranch & Oil Co., 13 T.C. 930. The issues are: 1. Did respondent err in including in taxable income for 1941 a surplus adjustment of $4,648.28 credited on petitioner's books in December 1942? 2. Did petitioner in 1943 realize a gain of $2,200 from the sale of gas air shovels? 3. Is petitioner entitled to deduct in 1943, 1944 and 1945, losses sustained in the operation of a farm and from the sale of such farm in 1945? 4. Is petitioner entitled to deductions in 1942 and 1943 of the respective amounts of $6,451.99 and $3,603.96 on account of Glassport traveling *12 expenses incurred in those years? 5. Did petitioner in its 1944 tax return properly credit $3,055.77 received from the Defense Plant Corp. in 1944 against traveling expenses incurred in that year? 6. Is petitioner entitled to deduct in 1943 the amounts of $965.28 and $575.60 alleged to represent traveling expenses? 7. Is petitioner entitled to deduct the amounts of $702.50, $398.57, and $480.73 in the respective taxable years 1943, 1944 and 1945, as expenditures made for automobile and truck tires in those years? 8. Is petitioner entitled to deductions totaling $8,013.67 in the year 1943, incurred by petitioner in that year with respect to its Wolf Summit job and later on petitioner's farm, which amount was initially charged in error to the Cook Contracting Co.? 9. Is petitioner entitled to a deduction in 1944 or 1945 of the sum of $25,497.29 as an alleged bad debt of Cook Contracting Co.? 10. Did respondent err, in each of the taxable years involved, in excluding $20,000, representing 200 shares of petitioner's capital stock exchanged in 1936 for certain machinery and equipment, in determining petitioner's excess-profits tax credit based on invested capital? 11. Did *13 respondent err, in each of the taxable years involved, in failing to allow petitioner depreciation with respect to the machinery and equipment acquired in 1936 in exchange for 200 shares of its capital stock? 12. Over what period of years is petitioner entitled to depreciate the cost of certain leasehold improvements? 13. What amount is petitioner entitled to deduct, in each of the years 1941 to 1945, inclusive, as reasonable compensation to its officers? 14. The amount of net operating loss deduction to which petitioner is entitled in each of the taxable years involved. 15. The amount of the unused excessprofits credit adjustments to which petitioner is entitled in each of the taxable years involved. The amounts involved in the last two issues depend on our decisions as to the prior issues, and will be redetermined in the recomputation under Rule 50. The facts were partially stipulated. The stipulated facts are found accordingly. General findings of fact will be followed by the findings of fact and opinion with respect to each issue, in the order above stated. Findings of Fact (General) Petitioner is a Pennsylvania corporation having its principal office and place *14 of business at Pittsburgh, Pennsylvania. Petitioner's Federal tax returns for the periods involved herein were filed with the collector of internal revenue for the 23rd district of Pennsylvania. Petitioner filed its tax returns on the calendar year basis and on the accrual method of accounting. Petitioner is an outgrowth of the Pittsburgh Engineering, Foundry and Construction Co., which failed and ceased to operate in 1934. In January 1935, H. A. Shipley, H. W. Parker, and E. L. Arnold, who had been employed as engineers by this defunct corporation, formed a common law trust. The business of the trust was primarily that of obtaining contracts for and designing and supervising heavy construction. All their fabrication work was sublet. Shipley, Parker and Arnold had some contracts but no money, and they borrowed $500 with which to commence the first job. On July 8, 1936 action was taken by the participants in the common law trust to dissolve such trust and form a corporation. On August 3, 1936 petitioner was incorporated with an authorized capital of $75,000, consisting of 750 shares of the par value of $100 per share. The assets of the trust were transferred to petitioner in exchange *15 for 290 shares of the common stock of petitioner. Shipley and Arnold each received 97 shares, and Parker 96 shares. The value of the assets exchanged for such stock has been determined by the respondent as having a basis of $5,771.94, and that valuation is not contested. Issue 1. Did respondent err in including in taxable income for 1941 a surplus adjustment of $4,648.28 credited on petitioner's books in December 1942? In determining the deficiency for the year 1941 the respondent increased petitioner's income by the sum of $4,648.28, with the following explanation: "Your net taxable income has been increased to the extent of $4,648.28 resulting from miscellaneous debits and credits to surplus during the taxable year." Findings of Fact On December 31, 1942 there was entered on petitioner's records a journal entry crediting surplus in the amount of $4,648.28. This net credit resulted from an entry charging accounts receivable with $8,33.99 and crediting surplus with a like amount to adjust the accounts receivable control account to the actual balance of accounts receivable as of January 1, 1942. This was followed by a charge to surplus of $3,685.71, occasioned by offsetting *16 adjustments, to adjust accounts payable control account to its actual detail as of December 31, 1941. These adjustments netted the amount of $4,648.28, which was recorded on petitioner's books as a credit to surplus as of December 31, 1942. All of this amount arose prior to the year 1941. Opinion This issue involves the question whether petitioner received taxable income in 1941 because of the book adjustments made in December 1942, reflecting a net increase in surplus of $4,648.28. The respondent makes no request as to the facts, and advances no argument on brief as to this issue. The petitioner did not attempt to show in what year or years prior to 1941 the amounts reflected in the net surplus increase accumulated, nor do we think it was required to do so, since the year 1941 is the one before us. Our finding of fact that all the amount reflected in the book adjustments of December 1942 resulting in the increase in net surplus arose before 1941, disposes of the issue. We hold that respondent erred in including the amount of $4,648.28, credited to surplus on December 31, 1942, as income in the taxable year 1941. Michigan Central Railroad Co., 28 B.T.A. 437, 460 *17 (modified on other issues, 79 Fed. (2d) 247. Issue 2. Did petitioner in 1943 realize a gain of $2,200 from the sale of gas air shovels? In his deficiency notice the respondent increased petitioner's income by the amount of $2,200 for the year 1943, with the following explanation: "It is determined that you realized an ordinary gain in the taxable year 1943 in the amount of $2,200.00 resulting from the sale of Erie Gas Air Shovels held for less than six months." Findings of Fact Petitioners, on December 31, 1942, made a deposit of $200 on a bulldozer. On March 24, 1943 petitioner paid $2,150 for a used Erie gas air shovel. The bulldozer and shovel were returned to the seller. On May 27, 1943 petitioner's records reflect a credit of $2,350, canceling out the deposit on the bulldozer and the cost of the shovel. Opinion The record clearly establishes the foregoing facts. We therefore conclude that the respondent erred in determining that petitioner realized any gain from such transactions. Issue 3. Is petitioner entitled to deduct in 1943, 1944 and 1945, losses sustained in the operation of a farm and from the sale of such farm in 1945? Petitioner claims *18 it is entitled to deductions for losses sustained in the operation of a farm and the sale of such farm, as follows: Losses on
Year
Operation
Loss on Sale
1943
$1,320.56
1944
5,059.61
1945
2,929.31
$3,490.47
Findings of Fact In 1943 petitioner purchased a 97-acre farm in Westmoreland County, Pennsylvania, at a cost of $7,600. The farm was underlaid with Freeport Seam deep mine coal and petitioner's officers were of the opinion that about 700 acres of additional surrounding coal lands could be purchased. It was decided to take title in the name of Shipley, one of petitioner's officers, and one Cook, since the officers did not want the surrounding landowners to know the land was being purchased by a corporation, for fear such knowledge would block he purchase of additional lands. On May 3, 1943 petitioner's board of directors adopted a resolution authorizing the purchase of the 97-acre farm "in the name of the Company or an individual name, as agent or trustee for the Company." Petitioner thereupon purchased the farm, and the deed was executed to H. A. Shipley and J. J. Cook. Shortly after the receipt of the deed, petitioner's attorney prepared a deed *19 for the premises from Shipley and wife and Cook and wife to the corporation. Shipley, his wife and Cook signed the deed but Mrs. Cook was not available and the deed remained in the office of the attorney awaiting the signature of Mrs. Cook. In 1945 when the farm was sold, petitioner's attorney decided to short-cut the transaction, and had Shipley and his wife and Cook and his wife execute a deed directly to the purchaser. Petitioner received the proceeds of the sale. After petitioner purchased the farm, efforts were made to purchase adjoining coal lands without success. Certain improvements were made to the buildings, and farming operations were carried on. The dwelling house was improved; a new roof was put on the barn; the spring house was rebuilt; a chicken house, a silo and an addition to the barn were erected. In the taxable years 1943, 1944 and 1945 petitioner, in operating the farm, expended various sums for farm labor, feed, insurance, taxes, etc. In 1944 petitioner had income from the sale of produce from the farm totaling $3,073.38. In 1945 nothing was sold except one horse, which was sold for $72. Petitioner sustained a loss from the operation of the farm in the amount *20 of $1,320.56 in 1943, $5,059.61 in 1944, and $2,929.31 in 1945. On the sale of the farm in 1945, petitioner sustained a loss in the amount of $3,490.47. Opinion The record satisfactorily establishes that the petitioner furnished the consideration for the purchase of the farm and the improvements made thereon and received the income therefrom and the proceeds from the ultimate sale thereof. Title was taken in the name of the individuals rather than the corporation for legitimate reasons and pursuant to authorization of petitioner's board of directors. The individual grantees made no claim of any interest therein other than as agents or trustees of petitioner. The respondent contends that the purchase of the farm was ultra vires of the corporation and that the directors were individually liable to the corporation for the losses sustained and, therefore, the losses claimed are not properly deductible. The premise for respondent's argument that the purchase of the farm by the corporation was ultra vires is that under section 301 of the Business Corporation Law of Pennsylvania a business corporation shall have "authority to perform only such acts as are necessary or proper to accomplish *21 the purpose or purposes for which it is organized, and which are not repugnant to the law," and he points out that the purposes for which petitioner was organized, as set forth in its charter, were: "To act as engineers, and contractors; to do fabricating, machine work, construction of factories, coal tipples, glass plants, and all types of material handling and storage units." It is a general rule that a corporation possesses all the powers, not repugnant to law, set forth in its charter, and such general powers as are specifically authorized by the law of the state in which it is incorporated. 6 Fletcher (Per. Ed.) § 2520. Section 302 of the Business Corporation Law of Pennsylvania specifically authorizes business corporations to purchase, take, receive and otherwise acquire, and to own, hold and otherwise deal with real or personal property, or any interest therein, which may be appropriate to enable it to accomplish fully and properly its purpose or purposes. The record makes clear that the real property in question was acquired by petitioner because of the underlying coal seam, and not for the purpose of carrying on farming operations. The purposes of acquisition appear to *22 be appropriate to accomplish fully petitioner's corporate purposes. The farming operations were incidental and temporary. A corporation may undertake many things in the enforcement of its rights and conservation of its property in which it could not engage as a primary business. 6 Fletcher (Per. Ed.) § 2489. On this record we conclude that the respondent's contention that the purchase and operation of the farm property were ultra vires of the corporation is without merit. We, therefore, hold that petitioner is entitled to deduct in the taxable years 1943, 1944 and 1945 the respective amounts of $1,320.56, $5,059.61 and $2,929.31, as losses sustained in the operation of the farm, and the amount of $3,490.47 in 1945 as a loss sustained on the sale of such farm. Issue 4. Is petitioner entitled to deductions in 1942 and 1943 of the respective amounts of $6,451.99 and $3,603.96 on account of Glassport traveling expenses incurred in those years? Findings of Fact On April 8, 1942 a contract was entered into between Pittsburgh Steel Foundry Corp., Glassport, Pennsylvania, Defense Plant Corp., a corporation created by the Reconstruction Finance Corporation to aid the Government *23 in its defense program, and petitioner, for the extension of facilities and the creation of new facilities at the plant of Pittsburgh Steel Foundry Corp. for the production of tank turrets and hulls. Under the agreement petitioner was to perform all necessary architectural and engineering services, furnish materials, labor and equipment, and perform the work for the construction of defense plant buildings and other related work in connection with the Glassport project on a site to be provided by the Defense Plant Corp. at Glassport. Defense Plant Corp. agreed to reimburse petitioner for the cost of the work and to pay petitioner a fixed fee in the amount of $68,104, which was to constitute complete compensation for petitioner's services to be performed under the contract, "including profit and all general overhead expenses, except for such overhead items as are hereinafter specifically included in the cost of the work." Among the items specifically included in the cost of the work was the following: "Transportation and traveling expenses to and from the work of the necessary field forces for the economical and successful prosecution of the work; transportation and traveling expenses *24 of the Engineer-Contractor and/or his representatives for required travel, and the expense of procuring labor and expediting the production and transportation of materials and equipment and inspecting such materials and equipment. All items herein, including the amount thereof, must either be authorized or approved by Owner. If any employee of Engineer-Contractor be in a travel status in excess of two weeks, it shall be at the expense of Engineer-Contractor unless otherwise approved by Owner." E. L. Arnold, of petitioner, was placed in charge of the Glassport job as "project engineer." Arnold had authority to employ engineers and other workers for the job after he had conferred with Shipley and Parker with respect to the employees' qualifications. Many of the engineers employed for the Glassport job were from Pittsburgh or other surrounding areas. They could demand rates in the community where they lived comparable to what they could obtain on the Glassport job, and they refused to drive to Glassport when they could obtain the same rates of compensation at a location nearer their homes. When these employees were employed by petitioner for the Glassport job it was understood they *25 would be paid traveling expenses to and from Glassport. In July 1942 certain employees who had traveled to Glassport submitted claims for their expenses incurred prior to that time. When these expense claims were submitted to the Defense Plant Corp. it refused to honor them and petitioner assumed liability for their payment. From then on the expense accounts with respect to travel to and from the Glassport job were always in controversy between the petitioner and Defense Plant Corp. By the end of 1942 petitioner had incurred and accrued traveling expenses in the amount of $6,451.99, part of which were paid during the year, but Defense Plant Corp. had refused to reimburse petitioner for these expenses. This situation continued throughout 1943. During 1943 petitioner incurred travel expenses with respect to the Glassport job in the amount of $3,603.96. It actually accrued on its books in 1943 travel expenses in an estimated amount of $2,800. After considerable correspondence and trips to Washington, D.C., Defense Plant Corp. finally in 1944 agreed to and did reimburse petitioner for said traveling expenses to the extent of $3,055.77. Opinion Petitioner was on an accrual basis. *26 The record, we think, establishes that petitioner became unconditionally liable for the payment of the traveling expenses to and from Glassport of the engineers it employed for the job, when it employed them, irrespective of whether petitioner was reimbursed by Defense Plant Corp. The dispute between petitioner and Defense Plant Corp. as to the amount for which petitioner should be reimbursed did not affect petitioner's right to accrue the expenses in the years in which they were incurred. To a taxpayer on an accrual basis, expenses are deductible when the liability becomes fixed, and the amount is either ascertained or definitely ascertainable from the facts known in the taxable year. United States v. Anderson, 269 U.S. 422; Lucas v. American Code Co., 280 U.S. 445; Brown v. Helvering, 291 U.S. 193. We hold that petitioner is entitled to deduct in the taxable years 1942 and 1943 the respective amounts of $6,451.99 and $3,603.96, on account of the Glassport traveling expenses incurred in those years. Issue 5. Did petitioner in its 1944 tax return properly credit $3,055.77 received from the Defense Plant Corp. in 1944 against traveling expenses *27 incurred in that year? Findings of Fact In 1944 petitioner received from the Defense Plant Corp. the sum of $3,055.77 in settlement of the dispute between petitioner and Defense Plant Corp. as to reimbursement of the traveling expenses of petitioner's employees with respect to the Glassport project in 1942. (See Issue 4.) In its 1944 income tax return petitioner credited this amount against travel expenses incurred in that year, thus in effect restoring such amount to petitioner's income in that year. In determining his deficiency for 1944 the respondent, consistent with his disallowance of the claimed deduction for traveling expenses in connection with the Glassport project for 1942, eliminated the amount of $3,055.77 from petitioner's income for 1944. Opinion At the hearing, the parties stipulated that in the event it was held that petitioner was entitled to deduct in the taxable year 1942 the amount of $6,451.99, as accrued traveling expenses with respect to the Glassport project, the sum of $3,055.77, which respondent eliminated from petitioner's income in 1944, should be restored to income for that year. Since, in Issue 4, we have held that petitioner is entitled to *28 deduct in the year 1942 the sum of $6,451.99 on account of traveling expenses incurred in that year, the sum of $3,055.77 is to be restored to petitioner's income for 1944 in recomputing the deficiencies under Rule 50. In his deficiency notice, respondent determined that petitioner sustained a loss of $25,867.52 in 1945 and allowed this amount as a loss carry-back to the year 1943. In his determination of this loss of $25,867.52, the respondent failed to restore to income in 1945 sundry credits to surplus in the amount of $4,603.58. Petitioner, on brief, concedes that, if it is allowed deductions for the full amount of the Glassport expenses in the years 1942 and 1943, the amount of $4,603.58 should be accounted for in determining the 1945 loss carry-back. This item of $4,603.58 was first disclosed at the hearing. Petitioner points out that the respondent made no attempt to amend his pleadings to bring this item into issue. However, since the item pertains to the deductions for traveling expenses in connection with the Glassport project for the years 1942 and 1943, which we have allowed as set forth in Issue 4, and in view of petitioner's concession, we hold that the amount of $4,603.58 *29 must be taken into consideration in the recomputation to be made under Rule 50. Issue 6. Is petitioner entitled to deduct in 1943 the amounts of $965.28 and $575.60 alleged to represent traveling expenses? Findings of Fact E. L. Eads, who was employed by petitioner as structural superintendent, on behalf of petitioner incurred traveling expenses in 1939, 1940 and 1941 in the respective amounts of $269.10, $420.23 and $275.95, totaling $965.28. Eads did not turn in his expense accounts until 1943, when he was reimbursed by petitioner. In 1943, H. W. Parker incurred traveling expenses on behalf of petitioner in the amount of $575.60, and turned over to petitioner vouchers covering said expenditures. Through a bookkeeping error the expenses were charged to Parker instead of being charged to travel expenses. In 1946 the error was discovered and was corrected by crediting Parker's account and charging the item to surplus. Opinion The amounts involved are not in dispute. The only question is whether the amounts are properly deductible in the year 1943. The amount of $965.28 covered expenditures made by Eads in years prior to 1943, but of which petitioner had no knowledge *30 until the claim was presented and paid in 1943. We think this amount was deductible by petitioner in its return for that year. Associated Gas & Electric Co., 2 B.T.A. 263; Old Colony Trust Associates v. Hassett, 55 Fed. Supp. 629. With respect to the amount of $575.60, for expenses incurred by Parker in 1943, the vouchers for this were in that year turned over to and accepted by petitioner, thus fixing its liability. The amount was then properly accruable by petitioner. The error in recording the payment of such amount on the books of the corporation does not control petitioner's right to the contested deduction. The fact, and not mere bookkeeping entries, is decisive. We hold that petitioner is entitled to a deduction of the respective amount of $965.28 and $575.60 in the taxable year 1943, as ordinary and necessary expenses. Issue 7. Is petitioner entitled to deduct the amounts of $702.50, $398.57 and $480.73 in the respective taxable years 1943, 1944 and 1945, as expenditures made for automobile and truck tires in those years? Findings of Fact In the years 1943, 1944 and 1945 petitioner purchased automobile and truck tires for use in its business *31 at a cost of $702.50, $398.57 and $480.73, respectively. Petitioner's books show these purchases, which are supported by vouchers, but petitioner was unable to produce the invoices. The records show the payments were made to Metropolitan Buick, Coleman Motors, etc. Opinion The amounts shown on the books are not in dispute. The respondent contends that, as petitioner was unable to produce invoices, it has not established that the expenditures were for ordinary and necessary expenses incurred in the respective years. Shipley testified that he knew of his own knowledge that the expenditures were made for tires used in petitioner's business. There was no contradictory evidence. We therefore hold that petitioner is entitled to a deduction in the years 1943, 1944 and 1945 of the amounts of $702.50, $398.57 and $480.73, respectively, as ordinary and necessary expenses incurred and paid in those taxable years. Issue 8. Is petitioner entitled to deductions totaling $8,013.67 in the year 1943, incurred by petitioner in that year with respect to its Wolf Summit job and labor on petitioner's farm? This amount was initially charged in error to the Cook Contracting Co. Findings of Fact
*32 For the year 1943, Cook Contracting Co. in its Federal tax returns claimed the following deductions: Trucking and Freight
Nov. 13, 1943, freight on shovel - B. & O.R.R.
$ 827.60
Nov. 24, 1943, deposit on railroad siding, B. & O.R.R.
1,176.00
Total trucking and freight
$2,003.60
Labor
Labor on Wolf Summit job
5,606.44
Labor
Labor on farm "owned by Mr. Shipley"
403.63
Total
$8,013.67
Upon audit of the 1943 tax returns of Cook Contracting Co., an internal revenue agent disallowed deductions for the above amounts. The trucking and freight expenses, totaling $2,003.60, were disallowed on the ground that these expenses were expenses of petitioner. The deduction for labor, amounting to $5,606.44, was disallowed on the ground that such labor was performed on the Wolf Summit job which was petitioner's job. The deduction for farm labor, amounting to $403.63, was disallowed on the ground that the farm was "owned by Mr. Shipley." On November 13, 1943 petitioner paid to the B. & O. Railroad $827.60 as freight on two shovels and a bulldozer, from Worthington, Pennsylvania, to Wolf Summit, for use on the Wolf Summit job of petitioner. On November 24, 1943, petitioner *33 deposited $1,176 with the B. & O. Railroad on a railroad siding. The total cost of such siding was $1,561.66, of which Freeport Gas Coal Company paid $385.66. The B. & O. Railroad refunded Freeport $442.37, and Freeport in turn refunded $56.71 to petitioner in 1944, which amount it reported as income in that year. The amount of $5,606.44, claimed by Cook Contracting Co. as a deduction for labor, was the cost of labor performed on petitioner's Wolf Summit job which was paid by petitioner but erroneously charged to the Cook Contracting Co. The item of $403.63 represented wages for two farmers employed on petitioner's farm in 1943. The wages were paid by petitioner in 1943 and erroneously charged to Cook Contracting Co. None of the above expenditures were claimed by petitioner as deductions on its 1943 return. Opinion The record clearly establishes that these expenditures were incurred and paid in 1943 by petitioner for the purposes set forth in our findings of fact. We therefore hold that petitioner is entitled to a deduction in the taxable year 1943 of the three amounts, aggregating $8,013.67, as ordinary and necessary expenses incurred in the operation of the business carried *34 on by petitioner. Issue 9 Is petitioner entitled to a deduction in 1944 or 1945 of the sum of $25,497.29 as an alleged bad debt of Cook Contracting Co.? Findings of Fact Cook Contracting Co. was a corporation organized in January 1941 to engage in coal stripping operations. Its capital stock was owned equally by John J. Cook, H. A. Shipley, H. W. Parker, and E. J. Arnold, the latter three being stockholders and directors of petitioner. At this time petitioner owned shovels suitable for coal stripping operations. Cook Contracting Co. had no bank account and petitioner advanced to it during 1941 to 1944, inclusive, funds for operating costs, such as payrolls, repair parts, oil, grease, gas, insurance, etc. A running account was kept between petitioner and Cook Contracting Co. showing debits, i.e., funds advanced for operations, and credits, constituting coal sales made by Cook Contracting Co., all proceeds of which were received by petitioner. Shovels owned by petitioner were rented to Cook Contracting Co. at a fixed rental. In 1941 petitioner received the sum of $20,050 and in 1942 the sum of $30,600 as rentals, which amounts petitioner returned as income in those years. *35 At a meeting of the directors of Cook Contracting Co., held on October 27, 1944, the operating statement and balance sheet of the company were examined, and it was pointed out that the company was indebted to petitioner in the approximate amount of $47,000 and to other creditors in the approximate amount of $14,000. It was also pointed out that operations throughout 1944 had proven successful and, as of June 30, 1944, the company had sustained a loss of approximately $8,000. It was thereupon resolved that the company would cease operations; the directors were authorized to sell all its machinery and equipment; and the company was to be liquidated. On December 29, 1944 the stockholders executed an agreement to dissolve the company, and on the same day the directors authorized its dissolution. On December 30, 1944, at a meeting of petitioner's board of directors, Shipley stated that at a meeting of the directors of Cook Contracting Co. held in October the company had authorized the sale of all the machinery and equipment and the dissolution of the corporation. Thereupon a resolution was passed as follows: "Resolved, that the proper officers of this company be and they are hereby, *36 authorized and directed to acquire at market prices from Cook Contracting Company those items of machinery and equipment owned by said company which can be used in the operation of this company and to make payment of the purchase price of items so acquired by a corresponding reduction in the Cook Contracting Company account and in their discretion to direct the accountants for the company to charge off as uncollectible the balance of said accounts." In December 1944, when Cook Contracting Co. was dissolved, it was indebted to petitioner in the amount of $58,692.34; miscellaneous credits of $1,743.59 reduced the indebtedness to $56,948.75. And the equipment of the Cook Contracting Co. was transferred to petitioner at its depreciated book value of $31,451.46, leaving a balance of $25,497.29. Prior to the time the equipment was turned over to petitioner at book value, various attempts by the Cook Contracting Co. to dispose of the same through sale were unsuccessful. In March 1945 a revenue agent proposed a deficiency in tax against the Cook Contracting Co. for the years 1940 to 1943, inclusive, in the amount of $954.77, which amount was paid by petitioner. In October 1945 Cook Contracting *37 Co. filed for refund of taxes on account of a loss carry-back originating in 1944. In 1947 Cook Contracting Co. received a refund of $12,786.23, which it turned over to petitioner in part payment of the indebtedness. Petitioner reported it as income in the year 1947. The fair market value of the equipment received by petitioner from the Cook Contracting Co. was not in excess of $31,451.46. Petitioner concedes that in the event this Court allows it a deduction for the year 1943 of the sum of $8,013.67, as expenses incurred on its Wolf Summit job, which were erroneously charged to Cook Contracting Co., its claim for a bad debt deduction in the amount of $25,497.29 should be reduced by that sum of $8,013.67. Under Issue 8, petitioner had been allowed for the year 1943 the amount of $8,013.67 as its expenses incurred in connection with the Wolf Summit job. The indebtedness of Cook Contracting Co. to petitioner in the amount of $17,483.62 became worthless in the taxable year 1944. Opinion The question of when an indebtedness becomes worthless so as to entitle a taxpayer to a deduction under section 23 (k) (1) of the Internal Revenue Code is one of fact, *38 and on the basis of the evidence we have found that the debt became worthless in the year 1944. The respondent argues that since, on December 31, 1944, the Cook Contracting Co. had an asset of substantial value, i.e., a claim for refund in the sum of $13,154.91, arising out of a net operating loss during 1944, the debt could not have been worthless in 1944. The claim for refund was not made until October 1945. It was unclaimed and undetermined as of December 1944. The amount of recovery, if any was too contingent to require petitioner to postpone claiming a bad debt deduction until final action was taken with respect to the claim. We think a proper accounting practice was to claim the bad debt deduction when the surrounding facts and circumstances, using a practical approach, indicated the loss had been sustained, and to return to income the partial recovery in the year when received. This is what petitioner did. We therefore hold that petitioner is entitled to a deduction of the sum of $17,483.62 in the taxable year 1944 as a bad debt. Issue 10. Did respondent err in each of the taxable years involved in excluding $20,000, representing 200 shares of petitioner's capital stock *39 exchanged in 1936 for certain machinery and equipment, in determining petitioner's excess-profits tax credit based on invested capital? Findings of Fact In 1934 Pittsburgh Engineering, Foundry and Construction Co. became financially involved and discontinued operations. Shipley, Arnold and Parker formed a common law trust under the name of Pittsburgh Industrial Engineering Co., in which each owned a one-third interest. On July 8, 1936, at a meeting attended by all shareholders, it was resolved to terminate the trust and form a corporation with a capital stock of 750 shares of the par value of $100 each, and that all the assets of the trust be transferred to the corporation in exchange for 290 shares of common stock. On July 11, 1936, Shipley, Arnold and Parker executed an application for a charter. This application was filed on August 3, 1936, and a certificate of incorporation was issued on the same date. Just prior to the incorporation of petitioner, Arnold was approached, by A. V. Crookston, who represented that he operated a business under the fictitious name of Reliance Realty Co., on a proposition to sell to Arnold all of the machinery and equipment in the plant formerly *40 occupied by the Pittsburgh Engineering, Foundry and Construction Co., and then held by Reliance Realty Co. Arnold made a deal with Crookston whereby Arnold agreed to pay Crookston $11,750 in par value stock of petitioner for such equipment. At a meeting of petitioner's board of directors held on August 10, 1936, Arnold stated that he was in position to secure the necessary machinery and equipment for the operation of the company's own shop in quarters already equipped, for a capital stock consideration of $20,000, and that the premises could be leased at a reasonable rental from Reliance Realty Co., instead of subletting contracts as the company was doing at that time. The officers were authorized and directed to investigate Arnold's proposition and to report their findings at the next meeting of the board. The minutes of the directors' meeting on August 13, 1936 contain the following report: "Mr. Shipley stated that he and Mr. Parker had investigated the proposition submitted by Mr. Arnold at the meeting of the Board on August 10, 1936 for acquiring machinery and equipment, consisting of various machines used for fabrication and assembling of structural steel (as shown in separate *41 schedule) for the consideration of $20,000.00 in full paid capital stock of the Company." It was thereupon resolved that the equipment be acquired for $20,000 in petitioner's capital stock and that the stock be issued to E. L. Arnold or his nominees. On August 6, 1936, A. V. Crookston had signed a bill of sale transferring this machinery and equipment to petitioner, and on August 10, 1936, Shipley executed a receipt acknowledging delivery of the machinery and equipment set forth in the bill of sale. Stock of petitioner was not immediately issued to the original incorporators or for the machinery and equipment. On January 16, 1937, 290 shares were issued, 97 shares to Shipley and wife, 96 shares to Parker, and 97 shares to Arnold and wife. On the same day 200 additional shares were issued to Arnold and his wife; 100 shares were sold to a Mr. Fisher and his wife for cash in the amount of $10,000; and 30 shares were sold to a Mr. Larimer for cash of $3,000. On July 9, 1937, 10 shares were sold to Mr. Eads for $1,000 in cash. Arnold originally intended to profit on his deal with Crookston to the extent of the difference between $11,750 in stock he was to pay Crookston and the $20,000 *42 in stock for which he sold the equipment to petitioner, and reported a gain of $8,250 on his personal income tax return on which he paid taxes. He later decided that he should not take advantage of Shipley and Parker, and so divided his stock profit with them. He therefore returned for cancellation 172 1/2 shares which had been issued to him for the equipment. These shares were thereupon issued as follows: A. V. Crookston
117 1/2 shares
Shipley and wife
27 1/2 shares
Parker
27 1/2 shares
Petitioner, since its receipt in 1936, has kept and used the machinery and equipment. In 1941, when petitioner's lease with Reliance Realty Co. was coming up for renewal, some question was raised by a then alleged agent of the lessor as to whether Crookston was the real owner of the equipment acquired by petitioner from him for $20,000 of its capital stock. Crookston had died, and petitioner was anxious to clear up the question as to its title to the machinery and equipment. Before signing a new lease petitioner demanded a new bill of sale from the lessor for such equipment. After some negotiations an arrangement was worked out. A statement was to be inserted in the new lease *43 to the effect that petitioner was the owner of the equipment. A new lease at an increased rental was executed on April 30, 1941. The certificate for 117 1/2 shares of petitioner's stock, which was issued to Crookston on January 16, 1937, was surrendered to petitioner without cost, and canceled. The fair market value of the machinery and equipment acquired by petitioner on August 10, 1936 in exchange for 200 shares of its capital stock of the par value of $100 each was not less than $20,000. Opinion The respondent, in determining the deficiencies for each of the taxable years involved, failed to include any amount with respect to the machinery and equipment acquired in 1936 in exchange for 200 shares of petitioner's capital stock in computing petitioner's excess-profits tax credit based on invested capital. Section 718 (a) (2) of the Internal Revenue Code provides that property acquired for stock shall be included in the computation of invested capital at an amount equal to its basis (unadjusted) for determining loss upon its sale or exchange. Section 113 (a) of the code provides: "BASIS (UNADJUSTED) OF PROPERTY. - The basis of property shall be the cost *44 of such property; * * *." Certain exceptions mentioned are not here applicable. Therefore the petitioner's basis is cost. Maltine Co., 5 T.C. 1265, 1272. The question, therefore, is the fair market value of the assets acquired in exchange for the issuance of the shares of petitioner's capital stock. The record establishes that the fair market value of the machinery and equipment which petitioner exchanged for 200 shares of its $100 per value stock was not less than $20,000. That the value of petitioner's stock at the time of the exchange was $100 per share clearly appears by the sale at the same time of 130 shares for a cash consideration of $13,000. Six months later 10 shares were sold for $1,000 cash. The fact that 117 1/2 shares, which were issued in the name of Crookston in connection with the acquisition of machinery and equipment, were retired in 1941 without cost is immaterial in determining petitioner's invested capital credit, as there was no return of capital embarked in the enterprise at the outset. It merely reduced the outstanding number of shares and increased the equity in the remaining shares. Central Wisconsin Creamery Co., 15 B.T.A. 396; *45 Lincoln Cotton Mills, 15 B.T.A. 680. The respondent argues that the issuance of the 82 1/2 shares of petitioner's capital stock to Arnold in connection with the acquisition by petitioner of the machinery and equipment in exchange for 200 shares of its capital stock was illegal and that a suit to cancel the shares would lie. The basis of this argument is that Arnold's making a profit on the transaction was a breach of his fiduciary relationship as a director. But the bona fides of this transaction as between Arnold and petitioner, we think, is immaterial here. Cooper-Brannon Naval Stores Co., 9 B.T.A. 105, 108. The record establishes that petitioner did acquire property of a fair market value in excess of the fair market value of its capital stock issued in exchange therefor, which property it has since retained and used in its business. We therefore hold that the respondent erred in failing to include the cost of such property in the amount of $20,000 in equity invested capital in determining petitioner's excess-profits tax credit for each of the respective taxable years involved. Issue 11. Did respondent err in each of the taxable years involved in *46 failing to allow petitioner depreciation with respect to the machinery and equipment acquired in 1936 in exchange for 200 shares of its capital stock? Findings of Fact The facts in connection with the acquisition of the machinery and equipment in 1936 are set forth in detail in the preceding issue and need not be repeated here. In determining the deficiencies herein, the respondent failed to allow depreciation in each of the taxable years involved with respect to the machinery and equipment acquired by petitioner in exchange for 200 shares of its capital stock. Petitioner claims it is entitled to additional depreciation based on its cost on account of such machinery and equipment acquired as aforesaid in the amount of $1,200.02 in each of the years 1941 to 1945, inclusive. Opinion Section 23 (1) of the Internal Revenue Code permits a deduction on account of depreciation. Section 114 of the code provides that the basis for depreciation should be the adjusted basis provided in section 113 (b) for the purpose of determining gain. Section 113 (b) provides that the adjusted basis for determining gain shall be the basis determined under section 113 (a), which *47 provides that the unadjusted basis of property shall be the cost, with certain exceptions not applicable here. Under the preceding issue we held that the cost of such machinery and equipment to petitioner was $20,000. We, therefore hold that the respondent erred in failing to allow petitioner depreciation with respect to the machinery and equipment acquired in 1936 as aforesaid, in the amounts claimed in each of the respective taxable years involved herein. Issue 12. Over what period of years is petitioner entitled to depreciate the cost of certain leasehold improvements? Findings of Fact Petitioner entered into a lease with Reliance Realty Co. on April 30, 1941. The lease was to run for five years, commencing May 1, 1941. Petitioner made certain leasehold improvements on the premises covered by the lease. In computing the depreciation with respect to those leasehold improvements the respondent allowed depreciation deductions on the assumption that the unexpired term of the lease beginning in 1943 was 4 1/3 years, in 1944 3 1/3 years, and in 1945 2 1/3 years. Petitioner claims it is entitled to depreciation based upon the unexpired term, beginning in 1943, of 3 1/3 years, *48 in 1944 of 2 1/3 years, and in 1945 of 1 1/3 years. Opinion The respondent, on brief, concedes that the depreciation allowable on such leasehold improvements for the years 1943, 1944 and 1945 is in the respective amounts of $4,369.78, $5,555.86 and $5,555.86, and we so hold. Issue 13. What amount is petitioner entitled to deduct in each of the years 1941 to 1945, inclusive, as reasonable compensation to its officers? Findings of Fact The officers of petitioner during the taxable years involved were H. A. Shipley, president, H. W. Parker, vice-president, and E. L. Arnold, secretary and treasurer. The following schedule sets forth the amounts paid by petitioner as compensation to its three executives, and the amounts allowed and disallowed by the respondent in each of the years 1941 to 1945, inclusive, in determining the deficiencies involved herein: Paid and
Allowed
Disallowed
Claimed
by
by
in Return
Respondent
Respondent
1941
H. A. Shipley
$20,400
$10,000
$10,400
H. W. Parker
15,300
7,500
7,800
E. L. Arnold
15,300
7,500
7,800
1942
H. A. Shipley
20,400
10,000
10,400
H. W. Parker
15,300
7,500
7,800
E. L. Arnold
5,100
2,500
2,600
1943
H. A. Shipley
20,400
10,000
10,400
H. W. Parker
15,300
7,500
7,800
E. L. Arnold
1944
H. A. Shipley
13,600
10,000
3,600
H. W. Parker
10,200
7,500
2,700
E. L. Arnold
6,056
5,000
1,056
1945
H. A. Shipley
13,572
10,000
3,572
H. W. Parker
10,192
7,500
2,692
E. L. Arnold
10,192
7,500
2,692
*49 During the year 1938 Shipley, Parker and Arnold, each received a salary of $4,500; in 1939 each received $4,550; and in 1940 each received $5,325 from petitioner. The respondent allowed such amounts in full. Arnold, Shipley and Parker were the original incorporators of petitioner. Each was a member of the common law trust, predecessor of petitioner. All three were engineers. Arnold was graduated from Kansas State College in 1928, with a Bachelor of Science degree. He specialized in civil engineering, particularly in structures, foundations, and related subjects. He alternately attended school and worked in the track, store, bridge, building and engineering departments of the Union Pacific Railroad. Later he was employed in the track department of the Kansas City Railroad. After Arnold received his degree he was employed by J. B. Klinn Iron and Foundry Company of Oklahoma City. Later he went to Pittsburgh and became connected with the Pittsburgh Engineering, Foundry and Construction Co., where he served in the capacity of field engineer, structural designer and designing engineer. When that company ceased business in 1934, he joined with Parker and Shipley in forming the common *50 law trust, and later joined with them in forming petitioner. With petitioner, Arnold was responsible for initial field investigations, subsurface investigations, design proportioning of concrete foundations, and proportioning of steel structures. He was in charge of the proportioning and investigation of all the work petitioner handled, until he went to the Glassport job. On April 8, 1942 petitioner entered into a contract with Pittsburgh Steel Foundry Corp., agent for Defense Plant Corp., for engineering and construction work on facilities for the production of turrets and hulls for M-12 tanks. This was the "Glassport project." Arnold as project engineer, had entire supervision of the project, made or supervised the initial field investigation of the sites for the transfer of some 4.3 acres of ground involving a certified survey based upon basic monuments of U.S. Harbor Lines; complete subsurface investigations of areas adjoining the Monongahela River by three-inch cores and undisturbed samples; design of the old construction for the reinforcing of all crane runways necessitated by the installation of 50-ton heavy duty cranes under continuous operation; design, layout and proportioning *51 of new facilities in a heavily congested area; ordering new materials; subcontracts; supervision and construction of new facilities; handling and installation of 2 1/2 to 3 million dollars' worth of machine tools purchased by the prime contractor and not included in the cost to petitioner of the project of approximately $1,742,000. In 1941 Arnold worked full time for petitioner and received a compensation of $15,300 per year. In 1942 he took over as project manager of the Glassport job, and was paid by petitioner for the first part of the year at the rate of $15,300, receiving $5,100, and for the balance of 1942 was paid at the same rate out of a special deposit of funds by Defense Plant Corp. against which checks were drawn by the petitioner in payment of charges certified by the prime contractor and approved by the Defense Plant Corp. During the year 1943 Arnold received no compensation from petitioner, but was paid at the rate of $15,300, per year out of the aforesaid special deposit by Defense Plant Corp. The Glassport job was completed in 1944 and, until its completion, Arnold continued to receive compensation at the rate of $15,300 from the Defense Plant Corp, fund, when he *52 was restored to petitioner's payroll at the reduced rate of $10,200 per year. Because of the falling off of business, the salaries of all three executives were reduced. In 1946 Arnold sold his stock to petitioner. He was instrumental in organizing a West Virgina corporation, where his salary was based entirely on production. H. A. Shipley, petitioner's president, was born in 1902. At the age of 19 he went to work as engineer in the drafting room of Pittsburgh-Des Moines Steel Co., and later had charge of the bridge engineering department. In 1925 he became chief engineer of the Pittsburgh Engineering, Foundry and Construction Co., and later became its sales manager. When that company ceased operations in 1934, Shipley joined in forming the common law trust, the predecessor of petitioner. In both of these organizations Shipley was in charge of sales. In the taxable years he received the highest compensation of the individuals whose salaries are contested. Arnold and Parker felt he was worth the higher salary because of his numerous contacts and ability to acquire business. H. W. Parker, was born and educated in Pittsburgh. He commenced his engineering experience with W. E. Moore *53 Co., builders of electrical steel smelting furnaces. His work with W. E. Moore Co. was mechanical drafting and electrical work. Later he commenced engineering work with Shaffer Engineering Co. of Pittsburgh, in conection with conveyors and material-handling work, remaining with this company for two years. He then went with the Koppers Construction Co., in the department known as the "material handling department," his work being in connection with conveyors of all descriptions. During his first two years with that company he went through a course of training in all branches of their engineering department. In 1927 he became associated with Pittsburgh Engineering, Foundry and Construction Co., where he remained until joining with Arnold and Parker in the common law trust. During the period the trust was in existence, Arnold and Parker supervised the engineering department. They did no fabricating and erecting. When petitioner was formed and acquired the machinery and equipment formerly owned by the Pittsburgh Engineering, Foundry and Construction Co., the fabricating was done in its shop. During the taxable years petitioner did much Government work in its plant, in addition to handling *54 the Glassport job heretofore described. Petitioner did work for Homestead Steel, Carnegie Steel in Chicago, and a plant in Utah, all in connection with steel plant construction for the war effort. Petitioner built nitric plants for American Cyanamid Co. It fabricated and erected all the steel and equipment for a large casting machine in Chicago for United States Steel and another for Republic Steel; supervised the construction of a furnace building for the Heppenstall Co., supervised the building of electrical furnaces for Sam Arno which were shipped all over the country; supervised the construction of coal tipples and rock handling systems for Pittsburgh Coal; a wax plant for Waverly Oil; mill buildings for Superior Steel, and a plant for National Valve. Shipley, Arnold and Parker did actual estimating, drafting and designing. All three executives worked hard, and long hours, usually seven days a week. Arnold and Parker did estimating work at home, where they had facilities and equipment. No one of these executives took any vacation during the periods involved. The compensation of the three executives was fixed by the board of directors at meetings held in January of each of the *55 taxable years except in 1941, when they were fixed at a meeting held on April 28, 1941. The salary of each officer was fixed by separate vote, each refraining from voting with respect to his own compensation. The petitioner's gross receipts, gross profit and net income or loss, before carry-overs and carry-backs, for the years 1938 to 1945, inclusive, as per tax returns, were as follows: Gross
Gross
Net Income
Year
Receipts
Profit
or Loss
1938
$227,960.54
$ 37,652.86
($15,712.26)
1939
187,656.04
29,458.40
( 20,295.12)
1940
263,240.07
71,512.86
18,294.72
1941
524,508.44
145,037.36
22,881.01
1942
577,760.82
226,038.39
87,531.81
1943
635,858.98
117,230.15
22,079.29
1944
266,941.28
27,634.13
( 26,628.46)
1945
223,360.84
51,287.75
( 61,102.53)
The compensation paid by petitioner to each of its three executives for services rendered to it in each of the taxable years involved was reasonable. Opinion The facts, we think, amply support our ultimate finding that the contested salaries were reasonable. The character of the work performed, the background, education and experience of all three executives, the long hours they *56 were required to work, the heavy responsibilities assumed, and the results achieved, in our judgment, establish the reasonableness of the compensation paid to them in the years in controversy. The record also contains other evidence which we find to be persuasive. Eugene T. Reardon, vice-president of Superior Steel Corp., Carnegie, Pennsylvania, who was formerly connected with American Steel and Wire Co. and the United States Steel Co. of Cleveland, Ohio, as chief engineer, and who prior thereto had been in charge of the outside construction on cable and rope as bridge engineer in the construction of the San Francisco-Oakland Bay Bridge, testified on behalf of petitioner. Mr. Reardon has had about 4,600 maintenance and engineering employees working for him over the years, and has employed a large number of engineers on various jobs of the types of that performed by petitioner. He was also familiar with several jobs performed by petitioner for Superior Steel before his connection with that company and with jobs which petitioner had done for other companies. He knew Shipley and Parker but not Arnold. He testified that Shipley was a "very capable engineer," and that construction work *57 done by petitioner was comparable to that of the best construction companies throughout the country. Based on his knowledge and experience, he expressed the opinion that the salaries paid by petitioner to its executives were reasonable. He further testified that during the period 1940-1945 good engineers were in strong demand and could obtain abnormal salaries, and that if these executives had made themselves available to him during that period he would have employed them at the salaries they drew from petitioner. The record also establishes with respect to Arnold, who was engineer on the Glassport job, a Government project, that his salary as fixed by petitioner's directors was certified by the prime contractor, other than petitioner, approved by the Defense Plant Corp., and paid from a special deposit fund of the Government during the major portion of 1942, all of 1943, and part of 1944. While such circumstance is not controlling on the question of reasonableness of the compensation paid to Arnold and his coexecutives, we think it is a factor that should be considered by us in determining the issue of reasonableness. The amounts paid by petitioner as compensation for services rendered *58 by its three executive officers in the taxable years involved, being reasonable, are proper deductions under section 23 (a) (1) (A) of the Internal Revenue Code. Issue 14. What is the amount of the net operating loss deduction to which petitioner is entitled in each of the taxable years involved? Issue 15. What is the amount of the unused excess-profits credit adjustment to which petitioner is entitled in each of the taxable years involved? The amounts involved in Issues 14 and 15 depend on our decision with respect to the prior issues, and will be redetermined in the recomputation under Rule 50 in accordance with the opinion herein. Decision will be entered under Rule 50.